No. 25-60200

# In the United States Court of Appeals for the Fifth Circuit

---

TEXAS TOBACCO BARN LLC, DOING BUSINESS AS
TXVAPEBARN, PETITIONER,

*vs.*

UNITED STATES DEPARTMENT OF HEALTH AND
HUMAN SERVICES, ROBERT F. KENNEDY, JR.,
SECRETARY, U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES; FOOD & DRUG ADMINISTRATION;
CENTER FOR TOBACCO PRODUCTS; MARTIN A. MAKARY,
FDA COMMISSIONER, RESPONDENTS.

---

*ON PETITION FOR REVIEW OF A FINAL DECISION ON REVIEW
OF ADMINISTRATIVE LAW JUDGE DECISION
DEPARTMENT OF HEALTH & HUMAN SERVICES*

---

**PETITIONER'S BRIEF**

---

J. GREGORY TROUTMAN*
TROUTMAN LAW OFFICE, PLLC.
  4205 Springhurst Boulevard, Suite 201
  Louisville, KY 40241
  (502) 412-9179
  *jgtatty@yahoo.com*
  *Attorney for Petitioner*
*Attorney of Record.

## CERTIFICATE OF INTERESTED PERSONS

## No. 25-60200; Texas Tobacco Barn LLC v. HHS, *et al.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1.  Texas Tobacco Barn LLC (Petitioner)

2.  J. Gregory Troutman (counsel for Petitioner)

3.  Troutman Law Office, PLLC (counsel for Petitioner)

4.  U.S. Department of Health and Human Services (Respondent)

5.  U.S. Food and Drug Administration (Respondent)

6.  Hon. Pamela Bondi (U.S. Attorney General)

7.  United States Department of Justice (counsel for Respondents)

8.  Robert F. Kennedy, Jr. (Respondent; HHS Secretary)

9.  Samuel R. Bagenstos (HHS General Counsel)

10. Mark Raza (HHS Chief Counsel)

11. Dr. Martin Makary (Respondent; FDA Commissioner)

12. Bret Koplow (Acting Director, Center for Tobacco Products)

13. Wendy S. Vicente (FDA Deputy Chief Counsel for Litigation)

14. Brian M. Boynton (Principal Deputy Assistant Attorney General)

15. Daniel Aguiar (counsel for Respondents)

16. Lindsey Powell (counsel for Respondents)

Petitioner Texas Tobacco Barn LLC does not have any parent corporation or any publicly held corporation that owns 10% or more of its stock.

/s/ J. Gregory Troutman
J. GREGORY TROUTMAN
*Attorney for Petitioner*

TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS................................. C-1

TABLE OF CONTENTS ......................................................... i

TABLE OF AUTHORITIES................................................... iii

JURISDICTIONAL STATEMENT ............................................ xi

STATEMENT CONCERNING ORAL ARGUMENT ........................ xii

GLOSSARY .....................................................................xiii

STATEMENT OF THE ISSUES............................................... 1

STATEMENT OF THE CASE................................................... 2

STANDARD OF REVIEW ...................................................... 7

SUMMARY OF ARGUMENT ................................................. 8

ARGUMENT..................................................................... 12

   I.   CTP'S AUTHORITY OVER ENDS PRODUCTS DERIVES FROM AN
      UNCONSTITUTIONAL DELEGATION OF LEGISLATIVE
      AUTHORITY. ................................................................ 12

      A.  THE MAJOR QUESTIONS DOCTRINE. ................................ 12

      B.  TOBACCO PRODUCTS AND THE MAJOR QUESTIONS
          DOCTRINE. ......................................................... 17

      C.  FDA'S PRIOR MAJOR QUESTION DOCTRINE HISTORY VIS-A-
          VIS TOBACCO PRODUCTS. .................................... 18

      D.  CONGRESS'S DELEGATION OF DEEMING AUTHORITY TO
          FDA VIOLATED THE MAJOR QUESTIONS DOCTRINE. ....... 19

II.  THE APPELLATE PANEL ERRED IN UPHOLDING THE ALJ'S DECISION WHICH DENIED TTB A JURY TRIAL CONTRARY TO *JARKESY*. ....................................................................... 24

A.  ANALYSIS OF *JARKESY*. ...................................................... 26

B.  OFFENSES RELATED TO THE SALE OF ADULTERATED OR MISBRANDED GOODS WERE TRIED TO A JURY AT COMMON LAW; *JARKESY* EXTENDS THAT RIGHT TO CMP CASES. .... 29

C.  THE FFDCA ALLOWS CTP UNFETTERED DISCRETION TO CHOOSE A REMEDY. ........................................................... 38

III.  THE FINAL DECISION IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE. ............................................................................... 39

A.  CTP'S ALLEGATIONS. ....................................................... 40

B.  CTP'S PROOF AT TRIAL. .................................................... 41

C.  CTP'S FAILURE TO CARRY ITS EVIDENTIARY BURDEN. .. 42

D.  THE INITIAL DECISION'S FINDINGS. .................................. 44

E.  THE SUBSTANTIAL WEIGHT OF EVIDENCE DOES NOT SUPPORT THE INITIAL DECISION. ...................................... 46

CONCLUSION ...................................................................................... 51

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS ............................... 52

CERTIFICATE OF SERVICE ...................................................................... 52

# TABLE OF AUTHORITIES

## CASES:

*Alabama Ass'n of Realtors v. HHS*,
594 U.S. 758 (2021)..............................................................16, 17

*Axon Enter. v. FTC*,
598 U.S. 175 (2023)....................................................…...........32

*Biden v. Nebraska*,
600 U.S. 477 (2023).............................................................16, 17

*Big Times Vapes, Inc. v. FDA*,
963 F.3d 436 (5th Cir. 2000)...............................................12

*Cigar Ass'n of Am. v. FDA*,
126 F.4th 699 (D.C. Cir. 2025)............................................21

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966).............................................................8

*Cuozzo Speed Techs, LLC v. Lee*,
579 U.S. 261 (2016).............................................................8

*Department of Transportation v. Association of American Railroads*,
575 U. S. 43 (2015)............................................................16

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)....................................................…....*passim*

*FDA v. Wages and White Lion Invs. LLC*,
604 U.S. ____, 145 S.Ct. 898 (2025)...........................…..........23

*Frey v. United States HHS*,
920 F.3d 319 (5th Cir. 2019).............................................….39

*General Land Off. of Texas v. Biden*,
722 F.Supp.3d 700 (S.D. Tex. 2024)........................…..........13

CASES—CONTINUED:

*Goodrich v. People*,
  3 Park CR. 622 (N.Y.S. Ct. 1858)………………………………..……33

*Goodrich v. People*,
  19 N.Y. 574, 580 (1859)……………………………………………….33

*Granfinanciera, S.A. v. Nordberg*,
  492 U.S. 33 (1989)…………………………………………………….26

*Guy Carpenter & Co. v. Provenzale*,
  334 F.3d 459 (5th Cir. 2003)………………………………………….28

*In re Deepwater Horizon*,
  739 F.3d 790 (5th Cir. 2014)……………………………………..…….8

*Jarkesy v. SEC*,
  34 F.4th 446 (5th Cir. 2022)………………………………………*passim*

*J.W. Hampton, Jr. & Co. v. U.S.*,
  276 U.S. 394 (1928)……………………………………………....….22

*Knapp v. U.S. Dep't of Agric.*,
  796 F.3d 445 (5th Cir. 2015)………………………………………….39

*Legato Vapors LLC v. Cook*,
  193 F. Supp. 3d 952 (S.D. Ind. 2016)…………………………………..4

*Legato Vapors LLC v. Cook*,
  847 F.3d 825 (7th Cir. 2017)……………………………………..…….4

*Loper Bright Enterprises vs. Raimondo*,
  603 U.S. ___, 144 S.Ct. 2244 (2024)………………………………....23

*Lopez-Munoz v. Barr*,
  941 F.3d 1013 (10th Cir. 2019)……………………………………20, 21

*Loving v. United States*,
  517 U.S. 748 (1996)……………………………………………....….13

CASES—CONTINUED:

*Marbury v. Madison,*
    5 U.S. 137 (1803)............................................................12, 13

*Murray's Lessee v. Hoboken Land & Improvement Co.,*
    59 U.S. 272, 18 How. 272 (1856)................................25, 27

*NFIB. v. OSHA,*
    595 U.S. 109 (2022).............................................................16

*Nicopure Labs, LLC v. FDA,*
    266 F. Supp.3d 360 (D. D.C. 2017)............................20, 22

*Panama Refining Co. v. Ryan,*
    293 U.S. 388 (1935)...........................................................20, 22

*Queen v. Jarvis,*
    3 F. & F. 108, 176 Eng. Rep. 49 (1862)..........................33

*Rex v. Dixon,*
    4 Camp. 12, 171 Eng. Rep. 5 (1814)..............................32

*Rex v. Dixon,*
    3 M. & S. 11, 106 Eng. Rep. 516 (1814)........................32

*Rex v. Wheatly,*
    2 Burr. 1124, 97 Eng. Rep. 746 (1761)..........................35

*SEC v. Chenery Corp.,*
    332 U.S. 194 (1947)...........................................................14

*SEC v. Jarkesy,*
    603 U.S. 109 (2024).....................................................*passim*

*State v. Norton,*
    24 N.C. (2 Iredell) 40 (1841)..........................................33

*Sottera, Inc. v. FDA,*
    627 F.3d 891 (D.C. Cir. 2010).........................................18

*Storio v. Borough of Point Pleasant Beach,*
    322 F.3d 293 (3rd Cir. 2003)...........................................13

CASES—CONTINUED:

*Treeve's Case*,
  2 East P.C. 821 (1796)..................................................................32

*Tull v. United States*,
  481 U.S. 412 (1987)................................................................9, 29

*United States v. Articles of Drug Consisting of Following: 5,906 Boxes*,
  745 F.2d 105 (1st Cir. 1984), *cert. den.*, 470 U.S. 1004 (1985).............3

*U.S. v. Boosted LLC*,
  No. 1:24-cv-01582 (D. Colo)....................................................27

*U.S. v. Fitzgerald*,
  No. 2023cv01130 (M.D. Fla.)....................................................27

*U.S. v. Lucky's Convenience & Tobacco LLC*,
  No. 22-cv-01237 (D. Kan.).......................................................27

*U.S. v. Morin Enterprises Inc.*,
  No. 2022cv02592 (D. Minn)......................................................27

*U.S. v. Moss*,
  872 F.3d 304 (5th Cir. 2017).......................................................8

*U.S. v. Seditious Vapours LLC*,
  No. 22-cv-01777 (D. Ariz.).......................................................27

*U.S. v. Soul Vapor LLC*,
  No. 2022cv00458 (S.D. W.Va.)..................................................27

*U.S. v. Super Vape'z LLC*,
  No. 22-cv-05789 (W.D. Wa.).....................................................27

*U.S. v. Vapor Craft LLC*,
  No. 22-cv-00160 (M.D. Ga.)......................................................27

*Util. Air Regulatory Group v. EPA*,
  573 U.S. 302 (2014)................................................................17

*Wages and White Lion Invs. LLC v. FDA*,
  90 F.4th 357 (5th Cir. 2024).....................................................23

*Wayman v. Southhard*,
  23 U.S. (10 Wheat) 1 (1825).....................................................15

**CASES—CONTINUED:**

*West Virginia v. EPA,*
    597 U.S. 697 (2022)…………………………………....…15, 16, 23

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001)………………………………………………13

**CONSTITUTIONS; STATUTES AND CONGRESSIONAL ACTS:**

United States Constitution, ART. I……………………………...………15

United States Constitution, ART. III…………………………1, 3, 4, 12

United States Constitution, AMEND. VII…………………………*passim*

Administrative Procedure Act (APA), 5 U.S.C. §§ 500, *et seq*…………...…7
    § 705…………………………………………………....…………8
    § 706……………………………………………………8, 40, 51

Consolidated Appropriations Act, 2022, PUB. L. 117-103, div. P., tit. I,
    subtitle B, 136 STAT. 49, 789-92 (Mar. 15, 2022)…………………….…21

Federal Food Drug and Cosmetic Act (FFDCA),
    21 U.S.C. § 301, *et seq*…………………………………*passim*
    § 321(rr)…………………………………………9, 19, 21
    § 331………………………………2, 10, 27, 38, 51
    § 332……………………………………2, 3, 26, 38
    § 333(f)(6)…………………………………...…*passim*
    § 333(f)(9)…………………………………...…*passim*
    § 337(a)…………………………………………26
    § 343…………………………………………37

Family Smoking and Tobacco Control Act,
    21 U.S.C. §§ 387, *et seq*…………………………………*passim*
    § 387(1)……………………………………………14
    § 387a(b)…………………………………………*passim*
    § 387b(6)(A)……………………………10, 29, 30
    § 387c……………………………………10, 29, 30, 36
    § 387g(a)(4)(B)(i) ………………………………… 14
    § 387g(c)……………………………………………14

CONSTITUTIONS; STATUTES AND CONGRESSIONAL ACTS—CONTINUED:

§ 387j(a)(i)...............................................................6
§ 387j(c)..................................................................30

Pure Food and Drug Act, PUB. L. 59-384, 34 STAT. 768 (Jan. 1, 1907).....37

Bill to Amend the Federal Food, Drug, and Cosmetic Act so as to Make that Act Applicable to Smoking Products, H.R. 2248, 89th Congress (1966)...................................................................17

REGULATIONS:

21 C.F.R. Part 17.........................................................3
§ 17.5....................................................................3
§ 17.6....................................................................3
§ 17.7....................................................................3
§ 17.8....................................................................3
§ 17.9....................................................................3
§ 17.23...................................................................3
§ 17.24...................................................................3
§ 17.25...................................................................3
§ 17.32...................................................................3
§ 17.33...............................................................3, 41
§ 17.39(b)................................................................3
§ 17.39(g).............................................................3 ,4
§ 17.43...................................................................3
§ 17.45...................................................................3
§ 17.47...................................................................3

61 FED. REG. 44,619 (Aug. 28, 1996)......................................18

81 FED. REG. 28,974 (May 10, 2016).......................................20

90 FED. REG. 10583 (Feb. 19, 2025)....................................22, 25

RULES:

FED. R. APP. P. 15(c)....................................................52

FED. R. APP. P. 27(d)(2).................................................52

RULES—CONTINUED:

FED. R. APP. P. 32(a)(5)……………………………………………..…….52

FED. R. APP. P. 32(a)(6)……………………………………………………52

FED. R. APP. P. 32(f)…………………………………………………………52

FED. R. APP. P. 34(a)……………………………………………………….xii

FED. R. CIV. P. 43………………………………………………………………4

FED. R. EVID. 101(a)……………………………………………………..….4

Fifth Circuit Rule 28.2.3……………………………………………………xii

OTHER RESOURCES:

155 CONG. REC. No. 50, H3802 - H3805 (Mar. 24, 2009)………………..……….21

155 CONG. REC. No. 82, S6009 - S6012 (Jun. 3, 2009)………………………......21

East's Commentaries, 2 East's P.C. 816-817 (1803)………………………35

FDA, *Premarket Tobacco Product Applications for Electronic Nicotine Delivery Systems: Guidance for Industry*, 20 (Mar. 2023)……………..…48

Federalist No. 10 (C. Rossiter ed. 1961) (J. Madison)………………….……16

Federalist No. 51 (C. Rossiter ed. 1961) (Madison)…………………..…….14

Fernando, D., *The Medieval History Behind A Baker's Dozen*, Tasting Table (Jul. 11, 2023)……………………………………………………36

Gellhorn & P. Verkuil, *Controlling Chevron-Based Delegations*, 20 CARDOZO L. REV. 989 (1999)………………………………………………15

Hutt, P., *Criminal Prosecution for of Food at Common Law: Adulteration and Misbranding Law*, FOOD, DRUG, COSMETIC LAW J., 15(6), 382 (1960)…………………………………………………31, 34, 35, 37

**OTHER RESOURCES—CONTINUED:**

Klebe, E.R., *Actions of the Congress and the Federal Government on Smoking and Health*, Congressional Research Serv., Report No. 79-219 (Sept. 26, 1979)...........................................................17, 18

The Magna Carta (1215).............................................31, 32, 34, 35

The White House, *Fact Sheet: President Donald J. Trump Directs Repeal of Regulations That Are Unlawful Under 10 Recent Supreme Court Decisions* (Apr. 9, 2025).............................................................23

Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* (5th Ed. 1883)..........................................................................13

William Blackstone, *Commentaries on the Laws of England*, VOL. 3, (1778)...........................................................................32, 33

William Blackstone, *Commentaries on the Laws of England*, Vol. 4 (1769) (Jones 1823 translation)..............................................31, 35

## JURISDICTIONAL STATEMENT

This Court has jurisdiction to adjudicate this case under Section 303(f)(6) of the Federal Food Drug and Cosmetic Act (FFDCA), codified as 21 U.S.C. § 333(f)(6), to review the March 21, 2025 Final Decision on Review rendered by the Department of Health and Human Services Departmental Appeals Board as to the Petitioner, Texas Tobacco Barn LLC (TTB). The Final Decision upheld an administrative law judge's initial decision to impose a Civil Monetary Penalty (CMP) upon TTB. TTB filed a timely Petition for Review with this Court on April 14, 2025 within the 60-day deadline set forth in 21 U.S.C. § 333(f)(6), *see* ECF # 1, and venue is proper in this circuit thereunder as TTB is headquartered in Lubbock, Texas.

## STATEMENT CONCERNING ORAL ARGUMENT

Pursuant to FED. R. APP. P. 34(a) and Fifth Circuit Rule 28.2.3, TTB requests oral argument. This appeal raises important legal questions regarding the constitutionality the TCA's "deeming" provision, 21 U.S.C. § 387a(b); TTB's entitlement to a jury trial under the Seventh Amendment to the United States Constitution; and whether sufficient evidence supported the underlying administrative decisions. These questions represent novel issues before this Court and oral argument would thus assist the Court in adjudicating this appeal.

## GLOSSARY

APA      Administrative Procedure Act

APPH     Appropriate for the Protection of the Public Health

CTP      Center for Tobacco Products

ENDS     Electronic Nicotine Delivery Systems

FDA      Food and Drug Administration

FFDCA    Federal Food Drug and Cosmetic Act

HHS      Department of Health and Human Services

MDO      Marketing Denial Order

PMTA     Pre-Marketing Tobacco Product Application

TCA      Family Smoking Prevention and Tobacco Control Act

## STATEMENT OF THE ISSUES

TTB is a Texas retailer of Electronic Nicotine Delivery System (ENDS) products. The Respondent, Center for Tobacco Products (CTP), initiated an administrative action against TTB to impose a CMP pursuant to Section 303(f)(9) of the FFDCA, 21 U.S.C. § 333(f)(9), and Section 103(c)(3) of the Tobacco Control and Family Smoking Prevention Act (TCA).

TTB denied liability in its Answer and asserted affirmative defenses, including a challenge to CTP's authority because:

(1) the manner in which Congress conferred authority over ENDS products upon the Food and Drug Administration (FDA), of which CTP is a branch, pursuant to 21 U.S.C. § 387a(b) is unconstitutional in violation of the Supreme Court's Major Questions Doctrine holding in *FDA v. Brown & Williamson*, 529 U.S. 120 (2000);

(2) *SEC v. Jarkesy*, 603 U.S. 109 (2024), upholding *Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022), conferred TTB with a right to a jury trial and barred CTP from pursuing a CMP claim because of the unfettered discretion conferred upon it to choose an administrative forum instead of an Article III court; and

(3) CTP's claims are not supported by the evidence.[1]

---

[1] *See* ROA. 62 - 66.

The hearing officer found against TTB on each issue,[2] the appeals panel upheld such findings,[3] and TTB now seeks review of these questions before this Court.

## STATEMENT OF THE CASE

The TCA prohibits the sale of adulterated or misbranded ENDS products. *See* 21 U.S.C. § 331. The FFDCA and TCA authorize CTP to enforce this prohibition by bringing an action for injunctive relief in the district court, 21 U.S.C. § 332, or initiating an administrative proceeding within the Department of Health and Human Services (HHS) to impose a CMP, *id.* at § 333(f)(9). This appeal concerns CTP's attempt to invoke the latter option to impose a CMP through an HHS agency adjudication process.

### ENFORCEMENT OF THE TCA

The TCA affords CTP with two means of civilly enforcing its requirements and prohibitions *vis-à-vis* adulterated or misbranded ENDS products. 21 U.S.C. § 332 authorizes CTP to initiate an action in district court for injunctive relief which does not afford defending parties

---

[2] ROA. 6 – 10.

[3] ROA. 25 – 38.

a right to jury trial since the action is purely equitable in nature.[4] *United States v. Articles of Drug Consisting of Following: 5,906 Boxes*, 745 F.2d 105 (1st Cir. 1984), *cert. den.*, 470 U.S. 1004 (1985). Alternatively, 21 U.S.C. §333(f)(9) authorizes CTP to seek the imposition of a CMP through an administrative proceeding conducted by an administrative law judge within the HHS. The statute caps the amount of any CMP at $15,000.00 with an enhancement up to $250,000.00 per intentional violation.

### CMP ADMINISTRATIVE ADJUDICATION PROCEEDINGS

The provisions of 21 C.F.R. Part 17 govern all facets of CMP proceedings—pleading, §§ 17.5 – 17.9; discovery and prehearing information exchanges, §§ 17.23 – 17.25; motion practice, § 17.32; the conduct of hearings, §17.33; the filing of post-hearing briefs, § 17.43; the rendering of an initial decision, § 17.45; the administrative appeal process, § 17.47; and judicial review, § 17.47.

Many of the provisions of these rules closely parallel Article III trial proceedings. Yet, there are meaningful differences. Hearing officers in CMP cases are not generally bound by the Federal Rules of Evidence, *Id.* at § 17.39(b), and has the discretion to allow rebuttal witnesses, *id.* at §

---

[4] A right to a jury trial does, however, exist in a proceeding which alleges a violation of an injunction. *See* 21 U.S.C. § 332(b).

17.39(g). Article III civil actions always apply the Federal Rules of Evidence, FED. R. EVID. 101(a), and the allowance of rebuttal witnesses is not discretionary, FED. R. CIV. P. 43. The more formal proceeding affords the right to a jury trial, but the less formal proceeding does not.

**PROCEEDINGS BELOW**

On August 14, 2023, CTP initiated an administrative Complaint action against TTB.[5] CTP therein alleged that on May 13, 2023, "an FDA-commissioned inspector conducted an inspection of TXVapeBarn" and observed TTB's "TXV BARN BREWED Beetle Juice 12mg 30ML e-liquid product[6] (Specimen Product) available for sale."[7] CTP's Complaint sought the imposition of a civil monetary penalty against TTB pursuant to Section 303(f)(6) of the FFDCA and Section 103(c)(3) of the Tobacco Control and Family Smoking Prevention Act (TCA), codified as 21 U.S.C. § 333(f)(9).[8]

---

[5] ROA. 53 – 59.

[6] Such product is a bottled e-liquid intended for use in an open-system ENDS device. A description of open-system products is set forth in *Legato Vapors LLC v. Cook*, 193 F. Supp. 3d 952, 959 (S.D. Ind. 2016), *rev*. 847 F.3d 825 (7th Cir. 2017).

[7] ROA. 57 (Complaint, ¶17).

[8] ROA. 53 – 54, 59.

On October 11, 2024, TTB filed an Answer to CTPs' Complaint.[9] Therein, TTB denied liability to CTP and asserted affirmative defenses which alleged that CTP lacked authority to proceed on its Complaint because:

(1) the deeming authority which Congress conferred upon FDA, of which CTP is a branch, pursuant to 21 U.S.C. § 387a(b) is unconstitutional as applied to ENDS products[10] and

(2) *Jarkesy* conferred TTB with a right to a jury trial and barred CTP from pursuing a CMP claim because of the unfettered discretion conferred upon it to choose an administrative forum instead of an Article III court.[11]

On June 24, 2024, the parties virtually tried this case on the merits upon the proof presented by CTP—consisted of 13 exhibits and the testimony of 2 agency representatives.[12]

On November 26, 2024, the administrative law judge (ALJ) rendered her Initial Decision.[13] Therein, the ALJ found the Specimen Product was

---

[9] *Id.*, at 60 – 67.

[10] For purposes of this case, TTB narrowly confines its constitutional argument to open-system ENDS products.

[11] *Id.*, at 65.

[12] TTB preserved its constitutional arguments herein through presentation in its Answer, dispositive motion and post-trial brief filed in the administrative proceedings.

[13] ROA. 1 – 12.

a "new tobacco product" as defined in 21 U.S.C. § 387j(a)(1), which lacked a marketing order.[14] The ALJ further determined the Specimen Product was adulterated and misbranded, and held at least one of its ingredients was shipped in interstate commerce.[15] The ALJ addressed TTB's defense that CTP failed to prove the Specimen Product contained ingredients shipped in interstate commerce because that proof related to another TTB product not at issue, and found that a TTB representative admitted such connection.[16] Finally, the ALJ held an absence of jurisdiction to adjudicate TTB's constitutional challenge to the TCA's "deeming" provision or its right to a jury trial under *Jarkesy*.[17] The ALJ imposed a $19,192 civil monetary penalty as sought by CTP.[18]

TTB then timely filed an administrative appeal with the Departmental Appeals Board, Appellate Division, within the

---

[14] ROA. 6.

[15] ROA. 6 – 9.

[16] ROA. 8 – 9.

[17] ROA. 10.

[18] ROA. 10.

Department of Health and Human Services.[19] On March 21, 2025, the
Appeals Board issued its Final Decision (Final Decision) which upheld
the ALJ's Initial Decision in its entirely.[20] The Appeals Board found the
Initial Decision was "supported by substantial evidence in the record and
free of legal error."[21] As to TTB's defense, the Appeals Board found in
essence that a preponderance of the evidence suggests the bulk
ingredients observed at TTB's business premises were used in
manufacturing the Specimen Product and that such ingredients travelled
in interstate commerce.[22] Like the ALJ, the Appeals Board determined
that it could not adjudicate TTB's constitutional arguments.[23]

On April 14, 2025, TTB timely filed its Petition for Review.

## STANDARD OF REVIEW

This Court applies the Administrative Procedure Act (APA), 5 U.S.C.
§§ 500, *et seq*., when reviewing a challenge to an HHS appeals panel

---

[19] TTB further preserved its constitutional arguments in its briefs filed
with the Appellate Panel.

[20] ROA. 13 – 52.

[21] ROA. 25.

[22] ROA. 30 – 34.

[23] ROA. 35 – 38.

decision; 5 U.S.C. §§ 705 - 706, evaluating whether the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). This statutory rubric includes constitutional challenges to an agency action or regulatory scheme. *See Cuozzo Speed Techs, LLC v. Lee*, 579 U.S. 261 (2016).

This Court reviews an agency's factual findings under the substantial evidence standard which requires that such findings be supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). This Court reviews questions of law *de novo*, including constitutional determinations, *In re Deepwater Horizon*, 739 F.3d 790, 798 (5th Cir. 2014), and the interpretation of statutes or regulations, *U.S. v. Moss*, 872 F.3d 304, 308 (5th Cir. 2017).

## SUMMARY OF ARGUMENT

*First*, the TCA's deeming provision, 21 U.S.C. § 387a(b), and FDA's Deeming Rule adopted thereunder, represent an unconstitutional delegation of legislative authority. *Brown & Williamson, supra.,* held the regulation of tobacco products was a "major question" and that FDA lacked regulatory authority absent specific enabling legislation.

Congress broadly defined the term "tobacco product" when adopting the TCA, 21 U.S.C. § 321(rr), and therein identified only four tobacco product subsets for which it granted FDA immediate regulatory authority. Congress then delegated unfettered legislative authority to FDA under 21 U.S.C. § 387a(b) to determine which additional tobacco products it would regulate and when it would do so. Those determinations, however, were ones that only Congress could make given *Brown & Williamson's* major question holding. The Court should hold that both the deeming provision set forth in 21 U.S.C. § 387a(b) and FDA's Deeming Rule are unconstitutional.

*Second*, the Seventh Amendment preserves the right to a jury trial in actions at common law where the value in controversy exceeds twenty dollars. U.S. CONST., AMEND XVI. The CMPs issued under the TCA are legal in nature, akin to fines or damages, which historically required a jury trial at common law. The Supreme Court's recent ruling in *Jarkesy* confirms the right to a trial by jury in CMP cases if available at common law.

The Supreme Court established in *Tull v. United States*, 481 U.S. 412 (1987) that civil penalties intended to punish or deter, rather than merely

compensate, trigger the jury trial right. The TCA's penalties meet this standard because they are punitive when tethered to the enforcement of federal law. Moreover, the public rights exception in Seventh Amendment jurisprudence does not apply, as CMPs arise from traditional legal remedies which the common law recognized for selling adulterated or misbranded products. The failure to accord TTB a jury trial in the proceedings below violated the Seventh Amendment and requires that the Final Decision be vacated.

*Third*, the Appellate Panel erred in upholding the Final Decision because it is not supported by sufficient evidence. CTP alleged that TTB was selling the Specimen Product in violation of the FFDCA as being adulterated and misbranded.[24] The FFDCA deems that a product is adulterated if it has not received FDA marketing approval, 21 U.S.C. § 387b(6)(A), and misbranded if satisfying the multi-layered requirements of 21 U.S.C. § 387c. It is a violation of the FFDCA, as amended by the TCA, to offer for sale a misbranded ENDS product if one of more of its components was shipped in interstate commerce. 21 U.S.C. § 331(a).

---

[24] ROA. 54 (Complaint, ¶¶ 21 – 22).

CTP asserted in its Complaint that TTB impermissible offered the Specimen Product for sale[25] and that it received the Specimen Product's components through interstate shipments.[26] To support its assertion, CTP's trial proof included a photo array of both the Specimen Product being displayed in TTB's retail store and bulk ingredients stored at the non-retail portion of its business premises. At trial, CTP established those bulk ingredients travelled in interstate commerce but the ingredient list upon which it relied to connect those ingredients to the Specimen Product related instead to a completely different ENDS product whose ingredients did not coincide with its photo array of bulk ingredients. The Initial Decision nevertheless held that CTP satisfied its evidentiary threshold. The Appellate Panel erred in upholding the Initial Decision because it was not supported by sufficient evidence.

---

[25] ROA. 57 (Complaint, ¶17).

[26] ROA. 57 – 58 (Complaint, ¶ 23).

## ARGUMENT

### I.    CTP'S AUTHORITY OVER ENDS PRODUCTS DERIVES FROM AN UNCONSTITUTIONAL DELEGATION OF LEGISLATIVE AUTHORITY.

As a threshold matter, the Court should grant review, vacate the Final Decision and direct a dismissal of CTP's Complaint because its authority over open-system ENDS products derives from an unconstitutional delegation of authority. This issue requires the Court to apply the Supreme Court's Major Questions Doctrine holding in *Brown & Williamson vis-à-vis* open-system ENDS products given that Congress impermissibly delegated legislative authority to FDA to determine which products it regulates.[27]

### A.    THE MAJOR QUESTIONS DOCTRINE.

Article III of the Constitution vests "[t]he judicial power of the United States" and imposes a corresponding duty on federal courts "to say what

---

[27] CTP will undoubtedly assert that *Big Times Vapes, Inc. v. FDA*, 963 F.3d 436 (5th Cir. 2000) forecloses this argument. *Big Time Vapes* involved a pre-regulatory attack against the TCA's deeming provision under the Non-Delegation Doctrine. TTB presents a view of the underlying constitutional question through a different prism rooted firmly in the holding of *Brown & Williamson*. Further, the manner and force with which the Supreme Court has applied the Major Questions Doctrine since *Big Time Vapes* has changed the landscape. This Court's also now has a different experience *vis-à-vis* FDA's post-regulatory implementation of salient aspects of the TCA than it had when deciding *Big Time Vapes*.

the law is." *Marbury v. Madison*, <u>5 U.S. 137, 177-78</u> (1803). In turn,

Article I vests the Congress with all federal legislative power, and

"permits no delegation of those powers." *Whitman v. Am. Trucking*

*Ass'ns,* <u>531 U.S. 457, 472</u> (2001). The legislative "function belongs to

Congress ... and may not be conveyed to another branch or entity."

*Loving v. United States,* <u>517 U.S. 748, 758</u> (1996). This principle protects

the sovereignty of the American people and the political accountability of

those who govern. *General Land Off. of Texas v. Biden*, <u>722 F.Supp.3d</u>

<u>700, 737</u> (S.D. Tex. 2024); *Storio v. Borough of Point Pleasant Beach*, <u>322</u>

<u>F.3d 293, 300</u> (3rd Cir. 2003).

   Legislative power is defined as the:

> "authority, under the constitution, to make laws,
> and to alter and repeal them. Laws, in the sense in
> which the word is here employed, are rules of civil
> conduct, or statutes, which the legislative will has
> prescribed."

Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which*

*Rest Upon the Legislative Power of the States of the American Union* 108

(5th Ed. 1883). This power is "a predetermination of what the law shall

be for the regulation of all future cases falling under its provisions." *Id.*

The sanctity of legislative power, however, is compromised when

Congress delegates unelected FDA bureaucrats the authority which they

employ to adopt policies that enforce a *de facto* ban[28] on entire product categories.

The Major Questions Doctrine is baked into the interplay between the three branches to ensure continuity of the delicate synchronous orbit of the three branches that Madison envisioned[29] by cabining the legislative branch from delegating its authority on issues of vast economic or political importance. The Doctrine requires that agencies must identify clear congressional authority before seeking to claim legislative power over significant issues.

> "[T]he 'history and the breadth of the authority that [the agency] has asserted,' and the 'economic and political significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer such authority."

---

[28] CTP is also on shaky ground concerning the legal authority supporting FDA's adoption of those policies. FDA roots its *de facto* ban of flavored ENDS products on *SEC v. Chenery Corp.*, 332 U.S. 194 (1947). *Chenery* requires that agencies adhere to a formal rulemaking process if mandated by enabling legislation but otherwise permits their use of adjudicative processes to effect rulemaking.

The TCA clearly mandates that FDA adhere to a formal APA rulemaking process when adopting any "tobacco product standard," defined in 21 U.S.C. § 387g(c), which concerns a product's "components, ingredients [or] additives," 21 U.S.C. § 387g(a)(4)(B)(i). An "additive" includes "a flavoring" in an ENDS product. *Id.*, at § 387(1). FDA did not engage in the APA rulemaking process before enforcing its *de facto* ban but rolled out that policy when adjudicating flavored ENDS product premarket applications contrary to the TCA's rulemaking mandate.

[29] Federalist No. 51 at 319 (C. Rossiter ed. 1961) (Madison).

*West Virginia v. EPA*, <u>597 U.S. 697, 721</u> (2022), quoting *Brown & Williamson, supra.*, at 159-60.

In other words, legislation is generally not an "open book to which the agency [may] add pages and change the plot line." <u>597 U.S. at 723</u>, quoting Gellhorn & P. Verkuil, *Controlling Chevron-Based Delegations*, 20 Cardozo L. Rev. 989, 1011 (1999). As such, the Court presumed that "Congress intends to make major policy decisions itself, not leave those decisions to agencies." <u>597 U.S. at 723</u>.

Arguably, the Doctrine finds its origin in the Constitution's Vesting Clause[30] such that legislative power includes the inherent duty that Congress decides "important issues" while leaving agencies to merely "fill up details." *West Virginia*, at 737 (Gorsuch, J., concurring) (quoting *Wayman v. Southhard*, 23 U.S. (10 Wheat) 1, 42-43 (1825)). Alternatively, the Doctrine is grounded in the nature of the Constitution's "admittedly difficult" lawmaking process which:

> "effectively require[es] a broad consensus to pass legislation, the Constitution sought to ensure that any new laws would enjoy wide social acceptance, profit from input by an array of different perspectives during their consideration, and thanks to all this prove stable over time."

---

[30] <u>U.S. Const., Art. I, § 1</u>.

*Id.*, at 738, quoting Federalist No. 10, at 82-84 (J. Madison). Allowing Congress "to divest its legislative power to the Executive Branch would "dash [this] whole scheme." *Id.*, at 739, quoting *Department of Transportation v. Association of American Railroads*, 575 U. S. 43, 61 (2015) (Alito, J., concurring).

The Supreme Court's recent jurisprudence has rigorously applied the Doctrine by invalidating broad agency mandates which lacked a clear Congressional authorization. *See e.g.*, *Biden v. Nebraska*, 600 U.S. 477, 489 (2023); *West Virginia, supra; NFIB. v. OSHA*, 595 U.S. 109 (2022) (*per curiam*); *Alabama Ass'n of Realtors v. HHS*, 594 U.S. 758, 760 (2021) (*per curiam*). Each case involved unelected and unaccountable bureaucrats seizing authority to regulate a major area of the economy absent a specific congressional authorization. In some instances, the agencies enacted policies which Congress had expressly rejected. *See NFIB*, at 122 (Gorsuch, J., joined by Thomas & Alito, JJ., concurring) ("Congress has chosen not to afford OSHA . . . the authority to issue a vaccine mandate" and "the Senate even voted to disapprove its regulation."); *West Virginia*, at 724 ("Congress had conspicuously and repeatedly declined to enact" carbon dioxide emissions regulations which

EPA adopted); *Alabama Ass'n of Realtors*, at 760 ("the CDC decided to do what Congress had not.").

## B. TOBACCO PRODUCTS AND THE MAJOR QUESTIONS DOCTRINE.

So, what about tobacco products? The Supreme Court's decision in *Brown & Williamson* demonstrated why the Major Questions Doctrine applies here because the salient inquiry is "not whether something should be done; it is who has the authority to do it," *Biden, supra.*, at 480. The Doctrine looks to the underlying statutory text and legislative history, *Util. Air Regulatory Group v. EPA*, 573 U.S. 302, 341 (2014).

The legislative history here shows a firm policy of congressional restraint *vis-à-vis* the regulation of tobacco products. Congress considered 75 smoking-related bills between the Surgeon General's 1964 landmark report on smoking and 1978.[31] Congress even went as far as *proposing* an amendment to the FFDCA which would have granted FDA regulatory authority over tobacco.[32] Instead, Congress took the

---

[31] Klebe, E.R., *Actions of the Congress and the Federal Government on Smoking and Health*, Congressional Research Serv., Report No. 79-219 (Sept. 26, 1979); *see also Brown & Williamson, supra.,* at 137-38.

[32] *See Bill to Amend the Federal Food, Drug, and Cosmetic Act so as to Make that Act Applicable to Smoking Products*, H.R. 2248, 89th Congress (1966).

significantly more restrained step of enacting the first cigarette labeling act.[33] Before 2009, Congress's regulatory tact was both measured and glacial.

### C. FDA'S PRIOR MAJOR QUESTION DOCTRINE HISTORY VIS-A-VIS TOBACCO PRODUCTS.

FDA, however, has not shared Congress's historic restraint regarding the regulation of tobacco products. In 1996, Congress invoked the FFDCA to classify nicotine as a drug, and cigarettes as a drug delivery device. *See* 61 FED. REG. 44,619, *et. seq.* (Aug. 28, 1996). In *Brown & Williamson*, the Supreme Court analyzed tobacco's historic and economic significance, observing that it concerned a "significant portion" of the American economy and occupied a "unique place in the nation's history and society." 529 U.S. at 159-60. The Court thus held the regulation of tobacco was a "major question" and FDA lacked regulatory authority over tobacco absent Congress passing specific enabling legislation.[34] *Id.*, at 126.

---

[33] *See also*, Klebe, *supra*.

[34] This was not FDA's only attempt at a regulatory overreach involving tobacco products. Prior to the TCA's adoption, FDA attempted to regulate ENDS products as a drug device under the FFDCA. Like *Brown & Williamson*, a legal challenge ended FDA's attempted power grab vis-à-vis ENDS products. *See Sottera, Inc. v. FDA*, 627 F.3d 891 (D.C. Cir. 2010).

This holding conclusively bound Congress and FDA going forward and should have made Congress abundantly aware of the resulting consequences of failing a Major Questions Doctrine test *vis-à-vis* the regulation of tobacco products.

The Supreme Court meant what it said. Congress did not listen.

### D. CONGRESS'S DELEGATION OF DEEMING AUTHORITY TO FDA VIOLATED THE MAJOR QUESTIONS DOCTRINE.

*Brown & Williamson* meant that Congress had to construct the blueprint of any regulatory framework for tobacco products. Identifying the scope of what to regulate—defining what constitutes a "tobacco product" and determining which ones to place within FDA's regulatory control—was the foundational cornerstone of any regulatory framework.

The TCA was Congress's response to *Brown & Williamson*; crafted upon the extant "tobacco product" definition. 21 U.S.C. § 321(rr). As it did in its earlier tobacco legislation, Congress did not go full throttle in its grant of regulatory authority; cabining FDA's immediate regulatory authority to only four specific tobacco product subsets (cigarettes, cigarette tobacco, roll-your-own tobacco, and smokeless tobacco). 21 U.S.C. § 387a(b). Congress then delegated FDA the legislative authority to "deem" any or all other "tobacco product" subsets within its regulatory

control. *Id*. In other words, Congress let the agency decide whether and when to regulate a substantial base of tobacco products subsets.

Worse, FDA failed to "provide standards for when and how [FDA] was to exercise its discretion to deem[.]" *Nicopure Labs, LLC v. FDA*, 266 F. Supp.3d 360, 392 (D. D.C. 2017). This failure became readily apparent to ENDS product stakeholders when FDA invoked this authority in May 2016 by way of its Deeming Rule. 81 FED. REG. 28,974, *et seq*. (May 10, 2016).

*Brown & Williamson* defined the constitutional limits concerning the regulation of tobacco products by saying that Congress, and only Congress, could authorize their regulation. Here, Congress did not authorize FDA to regulate any more than the four initial product subsets but punted that authority to the agency as to all other products. Again, defining the scope of which tobacco products to regulate was at the core of any regulatory framework—a quintessential legislative function. *See Panama Refining Co. v. Ryan*, 293 U.S. 388, 428-29 (1935) (regulations are valid only as subordinate rules and when found to be within the framework of the policy which the legislature has sufficiently defined); *Lopez-Munoz v. Barr*, 941 F.3d 1013, 1015 (10th Cir. 2019) ("Congress

alone has the power to define the scope of an agency's authority."). Whether Congress defined the scope of FDA's authority to regulate open-system ENDS products is the prime issue here.

Congress honored *Brown & Williamson's* clear mandate when defining the scope of FDA's regulatory authority up to the point of the TCA's "deeming" provision. Congress could have ended any debate by immediately placing all "tobacco products" under FDA's control in the TCA. Instead, Congress knew ENDS products existed when debating the TCA;[35] it nevertheless excluded them from the four 21 U.S.C. § 387a(b) product subsets; and it has never amended the statute to include them.[36] This delegation of legislative authority disregarded *Brown & Williamson's* major question holding.[37]

---

[35] *See e.g.* 155 CONG. REC. No. 50, H3802 - H3805 (Mar. 24, 2009) (statement by Rep. Buyer); 155 CONG. REC. No. 82, S6009 - S6012 (Jun. 3, 2009) (statement by Sen. Burr).

[36] Congress's 2022 amendment of the "tobacco product" definition, 21 U.S.C. § 321(rr), to capture synthetic nicotine products did not alter the 21 U.S.C. § 387a(b) list of tobacco products. *See* Consolidated Appropriations Act, 2022, PUB. L. 117-103, div. P., tit. I, subtitle B, 136 STAT. 49, 789-92 (Mar. 15, 2022).

[37] TTB is not the only one questioning the propriety of FDA invoking its deeming authority. *See Cigar Ass'n of Am. v. FDA*, 126 F.4th 699 (D.C. Cir. 2025) which held that FDA arbitrarily exercised deeming authority as to premium cigars; vacating the Deeming Rule as to those products. FDA did not seek certiorari and the D.C. Circuit's opinion is final. This Court could

Congress compounded this unlawful delegation by failing to provide standards to guide FDA's exercise of its authority to deem. *Nicopure Labs, supra., at* 392. FDA agreed in arguing that:

> "Congress's choice of the deferential word 'deems' and the absence of any standard—beyond the requirement that the product meet the 'tobacco product' definition—demonstrate that Congress committed the exercise of this authority to the agency's broad discretion."[38]

*Id*. FDA's broad discretion, however, begs the question, given *Brown & Williamson*'s clear mandate, that Congress define the scope of its authority.

Moreover, the relief sought here is directly in line with Section 2 of Executive Order 14219, 90 FED. REG. 10583 (Feb. 19, 2025) which requires that agencies initiate the process to cull all "unconstitutional regulations and regulations that raise serious constitutional difficulties, such as exceeding the scope of the power vested in the Federal Government by the Constitution" and "regulations that are based on unlawful delegations of legislative power." The White House later

---

also plausibly hold the Deeming Rule is arbitrary as to open-system ENDS products.

[38] The lack of guiding standards also presents a non-delegation doctrine question. *See Ryan, supra.*, at 430; *J.W. Hampton, Jr. & Co. v. U.S.*, 276 U.S. 394, 409 (1928).

clarified that agencies are to undertake its analysis after considering 10 key Supreme Court rulings, including *Loper Bright Enterprises vs. Raimondo*, <u>603 U.S. 369</u> (2024) and *West Virginia, supra*.[39]

The TCA's deeming provision and FDA's resulting Deeming Rule are unconstitutional because Congress violated *Brown & Williamson's* clear and unambiguous major question mandate by delegating FDA the legislative authority to add to the product subsets enumerated in <u>21 U.S.C. § 387(b)</u>. This violation then led FDA to the implement the TCA in an arbitrary manner *vis-à-vis* open system ENDS products as evidenced by this Court's prior acknowledgement in *Wages and White Lion Invs. LLC v. FDA*, <u>90 F.4th 357, 384</u>, n.5 (5th Cir. 2024) that FDA failed to adhere to the TCA's required rulemaking process before adopting any standard regulating the inclusion of flavors in ENDS products.[40] The fact that 12 separate federal circuits, the Supreme Court,

---

[39] The White House, *Fact Sheet: President Donald J. Trump Directs Repeal of Regulations That Are Unlawful Under 10 Recent Supreme Court Decisions* (Apr. 9, 2025) <u>https://www.whitehouse.gov/fact-sheets/2025/04/fact-sheet-president-donald-j-trump-directs-repeal-of-regulations-that-are-unlawful-under-10-recent-supreme-court-decisions/</u>

[40] The Supreme Court vacated *Wages* on other grounds while noting the subject argument was among several preserved upon remand. *FDA vs. Wages and White Lion Invs. LLC*, 604 U.S. ____, <u>145 S.Ct. 898</u> (2025).

FDA and industry stakeholders have had to devote so much time and effort to adjudicate so many flavored open-system ENDS product PMTA challenges is the best evidence why it was incumbent upon Congress to specifically vest FDA with regulatory authority.

The Court should thus determine the TCA's deeming provision, and FDA's 2016 Deeming Rule based thereon, are unconstitutional as to open-system ENDS products. Any finding of unconstitutionality mandates a grant of review which vacates the Final Decision with instructions to dismiss CTP's Complaint.

## II. THE APPELLATE PANEL ERRED IN UPHOLDING THE ALJ'S DECISION WHICH DENIED TTB A JURY TRIAL CONTRARY TO *JARKESY*.

Next, a reversal of the Final Decision is also mandated because TTB was entitled to a jury trial upon the disputed questions of fact alleged in CTP's Complaint. TTB demanded such relief in its Answer[41] and the Appellate Panel erred in upholding the hearing officer's denial of a jury trial.

---

[41] ROA. 87.

The Seventh Amendment to the United States Constitution provides that:

> "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law."

U.S. CONST, AMEND. VII. "The Constitution prohibits Congress from 'withdraw[ing] from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law'." *Jarkesy, supra.*, at 127, citing *Murray's Lessee v. Hoboken Land & Improvement Co.,* 59 U.S. 272, 18 How. 272, 284 (1856). *Jarkesy* thus stands for the proposition that the Seventh Amendment confers a constitutional right to a jury trial in cases where a federal agency seeks to impose civil monetary penalties exceeding $20.00 if a jury trial would have been available for the allegedly wrongful conduct at common law.[42] As shown herein, jury trials existed at common law for offenses involving the sale of adulterated or misbranded consumer products.

---

[42] *Jarkesy* is among the Supreme Court decisions which Executive Order 14219 requires FDA to consider in determining the future course of its regulatory actions.

## A.  ANALYSIS OF *JARKESY*.

HHS is the principal public health agency within the United States government and the parent agency over FDA, of which CTP is a branch. Congress characterized administrative proceedings within HHS as an enforcement of a public right by pronouncing that all enforcement actions "shall be by and in the name of the United States." 21 U.S.C §337(a). The Supreme Court, however, held in *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 61 (1989) that Congress cannot eliminate a party's Seventh Amendment jury trial right by relabeling an action as affecting a public right and placing exclusive jurisdiction in an administrative agency or a court of equity.

Congress established a structure in the FFDCA which allows CTP two enforcement options: (1) a civil action in district court for injunctive relief[43] or (2) an administrative proceeding before the HHS Departmental Appeals Board. Compare 21 U.S.C. § 332 to § 333(f)(9). Under the latter:

> "any person who violates a requirement of this chapter which relates to tobacco products shall be liable to the United States for a civil penalty in an amount not to exceed $15,000 for each such violation, and not to exceed $1,000,000 for all such violations adjudicated in a single proceeding."

---

[43] Ironically, 21 U.S.C. § 332(b) provides a right to a jury trial in any contempt proceedings.

21 U.S.C. § 333(f)(9)(A). As highlighted *infra.*, Congress gave CTP unfettered discretion to choose whether to initiate a civil action in a district court like it has in many other instances[44] or an administrative proceeding before an HHS administrative law judge. The latter, like *Jarkesy*, involves "'withdraw[ing]' the matter 'from judicial cognizance' and handing it over to the Executive Branch for an in-house trial." *Jarkesy, supra.*, at 151, citing *Murray's Lessee.*

*Jarkesy* tied the jury trial right to whether such right existed at common law. 603 U.S. at 120 ("The SEC's antifraud provisions replicate common law fraud, and it is well established that common law claims must be heard by a jury."). The question becomes whether the goal of an action arising under 21 U.S.C. § 331(k)—the abatement of an alleged statutory or regulatory violation for selling an adulterated or misbranded product—has traditionally afforded the allegedly offending party the right to a jury trial. TTB, for instance, would not have had a right to a

---

[44] *See e.g., U.S. v. Morin Enterprises Inc.*, No. 2022cv02592 (D. Minn); *U.S. v. Soul Vapor LLC*, No. 2022cv00458 (S.D. W.Va.); *U.S. v. Super Vape'z LLC*, No. 22-cv-05789 (W.D. Wa.); *U.S. v. Vapor Craft LLC*, No. 22-cv-00160 (M.D. Ga.); *U.S. v. Lucky's Convenience & Tobacco LLC*, No. 22-cv-01237 (D. Kan.); *U.S. v. Seditious Vapours LLC*, No. 22-cv-01777 (D. Ariz.); *U.S. v. Fitzgerald, et al.*, No. 2023cv01130 (M.D. Fla.) and *U.S. v. Boosted LLC*, No. 1:24-cv-01582 (D. Colo).

jury trial if CTP brought a civil action against TTB in district court for injunctive relief to bar future violations. In such instance, the Seventh Amendment does not apply to equitable actions of which an injunction is a quintessential example. *See Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 464 (5th Cir. 2003).

Non-injunctive civil actions, however, present a different situation because they represent actions at law. For example, assume a hypothetical zoning statute provides for the imposition of civil penalties to remedy violations and deter future violations. The defendant would, however, be entitled to demand that a jury both make any disputed factual findings necessary to substantiate an alleged violation and assess the penalty if the zoning authority brought a civil action to address an alleged violation by seeking a civil penalty. This was the gist of *Jarkesy*.

CTP did not seek equitable relief *vis-à-vis* TTB (*i.e.* imposition of an injunction), because Congress restricted its authority to seek anything beyond such relief in an Article III forum. CTP, instead, invoked the administrative process to seek a monetary penalty. This case, in every respect, is akin to the above hypothetical zoning case—with no meaningful difference between the goal which CTP seeks in this action

and the goal which the Securities and Exchange Commission sought in *Jarkesy*. The Supreme Court's ruling in *Jarkesy* absolutely applies to the type of dual enforcement arrangement which exists under the TCA. In fact, the Court held "civil penalt[ies are] a type of remedy at common law could only be enforced in courts of law." <u>144 S.Ct. 2117, 2122</u>, citing *Tull, supra.,* at 422. CTP has thus further proceeded in an extra-constitutional manner. The Court should thus grant review and vacate the Appeal Decision with instructions to dismiss CTP's Complaint.

### B. OFFENSES RELATED TO THE SALE OF ADULTERATED OR MISBRANDED GOODS WERE TRIED TO A JURY AT COMMON LAW; *JARKESY* EXTENDS THAT RIGHT TO CMP CASES.

*Jarkesy* looks to how the type of offense targeted by a monetary penalty claim was adjudicated at common law in determining whether a right to jury trial attaches. The offenses upon which CTP predicated its Complaint was that the Specimen Product was "adulterated" under <u>21 U.S.C. § 387b(6)(A)</u> and "misbranded" under <u>21 U.S.C. § 387c(a)(6)</u>.[45] TTB's right to a jury trial was inviolate because the common law afforded jury trials in cases involving the sale of adulterated or misbranded consumer products.

---

[45] *See* <u>ROA. 57</u> (<u>Complaint</u>, ¶¶ 17, 21 – 22).

The FFCDA and TCA consider that a tobacco product is "adulterated" if "it is required by section 387j(a) of this title to have premarket review and does not have an order in effect under section 387j(c)(1)(A)(i) of this title." 21 U.S.C. § 387b(6)(A). In turn, a "tobacco product shall be deemed to be misbranded" if:

> "it was manufactured, prepared, propagated, compounded, or processed in an establishment not duly registered under section 387e(b), 387e(c), 387e(d), or 387e(h) of this title, if it was not included in a list required by section 387e(i) of this title, if a notice or other information respecting it was not provided as required by such section or section 387e(j) of this title, or if it does not bear such symbols from the uniform system for identification of tobacco products prescribed under section 387e(e) of this title as the Secretary by regulation requires."

21 U.S.C. § 387c(a)(6). *Jarkesy* thus assured TTB a right to jury trial as to the allegations in CTP's Complaint if the common law preceding the FFDCA afforded a trial by jury in cases which sought to remedy the sale of adulterated or misbranded goods.

### i. COMMON LAW TREATMENT OF ADULTERATED GOODS

The modern administrative state and how it imposes regulatory penalties for the sale of adulterated or misbranded goods did not exist at common law. But the former manner of regulation does not stray

significantly from the latter. The common law treated the sale of adulterated consumable products as a misdemeanor—characterized as selling "unwholesome provisions."[46] Blackstone viewed the sale of adulterated consumable products as "common nuisances" and an "offense against the public order and economical regimen of the state.[47] Blackstone drew the distinction between public and private harms upon whether the harm impacted "the whole community in general."[48] Much like the FFDCA, the common law imposed graduated penalties for the sale of adulterated consumables: a fine for a first offense; pillory for a second offense; imprisonment for a third offense; and a public repudiation for a fourth offense.[49]

The Magna Carta (1215) introduced the concept of jury trials for public harms in providing that:

> "[n]o free man shall be seized or imprisoned, or stripped of his rights or possessions, or outlawed or exiled, or deprived of his standing in any way, nor

---

[46] Hutt, P., *Criminal Prosecution for of Food at Common Law: Adulteration and Misbranding Law*, FOOD, DRUG, COSMETIC LAW J., 15(6), 382, 383-84 (1960).

[47] Blackstone's *Commentaries on the Laws of England*, Vol. 4, CH. 13, p. 93 (1769) (Jones 1823 translation).

[48] *Id.*, at CH. 1, p. 4.

[49] *Id.*, at CH. 13, p. 93.

> will we proceed with force against him, or send
> others to do so, except by the lawful judgment of his
> equals or by the law of the land."

Magna Carta, ¶39. None of the English common law commentaries suggest this right to the "judgment of his equals" did not apply in "unwholesome provisions" cases.

Nearly 550 years later, *Treeve's Case*, 2 East P.C. 821 (1796) upheld a brewer's conviction for the common law misdemeanor for providing unwholesome provisions (knowingly delivering bread that was unfit for food); thus articulating Blackstone's "marketplace protection" theory like that embodied in the FFDCA.[50] Next, *Rex v. Dixon*, 4 Camp. 12, 171 Eng. Rep. 5, *aff'd*, 3 M. & S. 11, 106 Eng. Rep. 516 (1814) was the first fully reported decision which treated the provision of adulterated food as a common law misdemeanor. Jury trials were the tradition for adjudicating misdemeanors under the common law—a right which Blackstone termed as the:

> "glory of the English law and necessary for [t]he
> impartial administration of justice, which, if
> entirely entrusted to the magistracy, a select body
> of men, would be subject frequently [to] an
> involuntary bias towards those of their own rank
> and dignity."

---

[50] The securities laws at issue in *Jarkesy* are also predicated upon a market protection concept. *See Axon Enter. v. FTC*, 598 U.S. 175, 180 (2023) ("Congress established the SEC to protect investors in securities markets.").

William Blackstone, *Commentaries on the Laws of England*, Vol. 3, p. 379 (1778).

This common law principle of providing unwholesome provisions found its way into the law of the new nation. *State v. Norton*, 24 N.C. (2 Iredell) 40 (1841) involved the appeal of a disputed jury instruction which predicated guilt upon—whether a seller knowingly sold meat

> "in such a state as to render it unfit to be eaten according to the usages of decent and Christian people."

*Id.*, at 40-41. The court articulated a different legal standard which focused on a marketplace protection theory like that of Blackstone, *id.*, at 41, but did so without repudiating the propriety of a jury deciding disputed facts-to-law issues.

Another good example of this proposition is *Goodrich v. People*, 3 Park CR. 622 (N.Y.S. Ct. 1858), *aff'd* 19 N.Y. 574, 580 (1859) which upheld a jury's conviction for "selling unwholesome beef" and recognized the importance of a policy to protect the consumer marketplace from "the sale of unwholesome provisions" even in the absence of a resulting illness. English courts employed this same market protection legal theory in *Queen v. Jarvis*, 3 F. & F. 108, 176 Eng. Rep. 49 (1862) in a prosecution

for selling unwholesome meat that was not fit for food where a jury was left to decide the question.

Ultimately, Congress substantially incorporated both the same common law concept of adulterated product[51] and Blackstone's marketplace protection theory embodied in the FFDCA. With it, Congress is also deemed to have understood that the right to a jury trial of all disputed facts concerning the provision of adulterated products carried over into enforcing the modern regulatory regime. For purposes of *Jarkesy*, the Seventh Amendment vested TTB with the right to a jury trial to determine whether the Specimen Product was adulterated under the TCA because the common law would have recognized such right.

### ii. COMMON LAW TREATMENT OF MISBRANDED GOODS

The Magna Carta set standards for certain important consumer products in providing:

> "[t]here is to be a single measure for wine throughout our realm, and a single measure for ale, and a single measure for Corn, that is to say the London quarter, and a single breadth for dyed cloth, russets, and haberjects, that is to say two yards within the lists. And it shall be the same for weights as for measures."

---

[51] *Hutt, supra.*, at 382.

Magna Carta, ¶25. At common law, what we now call "misbranded" in reference to a consumable product was treated as a case of false representation or a "cheat" because the allegedly misbranded product was something "other than what it actually was."[52]

Blackstone's *Commentaries* described a "cheat" as an offense:

> "against public trade: as that cannot be carried on
> without a punctilious regard to 'common honesty,
> and faith between man and man."[53]

Like the manner it provided unwholesome provisions, the common law prosecuted cheats as a misdemeanor at common law when they "affected the public as a whole"[54] and "calculated to . . . deceive the people in general."[55] These cheats would have been tried by juries at common law.[56]

Thus, common law cheats often involved prosecutions for sellers who sold consumer products which did not meet a prevailing standard or was not as advertised. For instance, Section 25 of the Magna Carta set a standard measure for commodities like wine and grain. A purveyor

---

[52] Hutt, *supra.*, at 382, 390.

[53] Blackstone's *Commentaries*, Vol. 4, p. 156.

[54] Hutt, *supra.,* at 390.

[55] East's Commentaries, 2 East's P.C. 816-817 (1803).

[56] *Rex v. Wheatly*, 2 Burr. 1124, 97 Eng. Rep. 746 (1761).

committed a cheat if it sold a quantity of wine or grain which deviated from the standard measure. The retail response to "cheats" has survived into modernity—the concept of a "baker's dozen" finds its origins in 13th century England as a way of avoiding prosecution for false representation or a cheat.[57]

Here is an example of how to misbrand an ENDS product. The record shows that TTB sells a 1.2% nicotine ENDS product called *Beetlejuice* and a 2.4% nicotine product using the same name. A classic case of a cheat would occur if TTB marketed and sold an ENDS product under the guise of it being the 2.4% nicotine product but was instead the 1.2% nicotine product. Another example of a misbranded product would occur if TTB represented that its products contained a 30ml volume of fluid but instead only contained 27 ml. The actual product in both hypothetical instances would be something less than what was advertised.

Here, the FFDCA, as modified by the TCA, classifies an ENDS product as being "misbranded" if it lacks an FDA marketing order[58] such

---

[57] Fernando, D., *The Medieval History Behind A Baker's Dozen*, Tasting Table (Jul. 11, 2023).
https://www.tastingtable.com/1332008/medieval-history-bakers-dozen/

[58] 21 U.S.C. § 387c(a)(6).

that it would not be what the manufacturer represented. The TCA's concept of "misbranded" with respect to tobacco products thus does not meaningfully differ from that applied to food products.[59] In turn, such concept does not differ significantly from the concept of common law cheating.[60]

Congress first adopted the modern concept of adulteration and misbranding in the Pure Food and Drug Act[61] and later the FFDCA. The above cases, however, demonstrate that the common law afforded jury trials in cases of adulterated and misbranded products which affected public interests. That common law concept was the standard when Congress began regulating consumable products. *Jarkesy* means that any right to a jury trial *vis-à-vis* adulterated or misbranded products which existed at common law carried forward into the present modern regimes for enforcement purposes. TTB thus had a right to a jury trial as to the allegations set forth in CTP's Complaint.

---

[59] *See* FFDCA, Section 203, codified as 21 U.S.C. § 343.

[60] *Hutt, supra.*, at 383, n.6.

[61] Pub. L. 59-384, 34 Stat. 768 (Jan. 1, 1907).

## C.   THE FFDCA ALLOWS CTP UNFETTERED DISCRETION TO CHOOSE A REMEDY.

Finally, *Jarksey* bars an agency from having unfettered discretion to decide whether to pursue a monetary penalty claim in an administrative forum instead of a civil proceeding in district court under Article III of the Constitution. 34 F.4th at 462.

That is precisely the case here because the FFDCA allows CTP unfettered discretion to choose the forum in which to bring enforcement actions. CTP's Complaint asserts that TTB:

> "fail[ed] to obtain the required premarket authorization for its new tobacco product cause is to become adultered and misbranded while it is held for sale after shipment of one or more of its components in interstate commerce in violation of 21 U.S.C. § 331(k)."

Complaint, ¶23. An alleged violation of 21 U.S.C. § 331(k) presents CTP with dual options: a civil action in district court pursuant to 21 U.S.C. 332(a) or an administrative proceeding under 21 U.S.C. 333(f)(9). Neither statute, however, sets forth any constraints which cabins CTP's authority to choose either option.

This Court's *Jarkesy* ruling upheld by the Supreme Court required that Congress must give an agency "an intelligible principle by which to exercise" its power to choose between pursuing relief in an Article III

court or an administrative forum. 34 F.4th at 462. The delegation at issue in *Jarksey*, like the delegation here, is open-ended and lacks a girding "intelligible principle" which cabins CTP's exercise of authority given the absence of any standards set forth in 21 U.S.C. §§ 332(a) and 333(f). There is nothing stated in such statutes which articulates the criteria that CTP must consider when deciding between alternative remedies. Congress's failure to articulate an intelligible principle must negate CTP's choice of pursing this action in an administrative forum to the exclusion of TTB's right to a jury trial. The Court should thus grant review and vacate the Final Decision with instructions to dismiss CTP's Complaint.

## III. THE FINAL DECISION IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.

Finally, the Court should grant of review because the Appeal Panel erroneously upheld the Initial Decision as it was contrary to the substantial evidence. The Court reviews this question under the arbitrary and capricious standard, *Frey v. United States HHS*, 920 F.3d 319, 326 (5th Cir. 2019), and "focuses on whether an agency articulated a rational connection between the facts found and the decision made," *Knapp v. U.S. Dep't of Agric.*, 796 F.3d 445, 453 (5th Cir. 2015).

5 U.S.C. § 706(2)(E) mandates that the Court "hold unlawful and set aside agency action, findings, and conclusions" found to be "unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute." 920 F.3d at 325-26.

## A. CTP'S ALLEGATIONS.

CTP specifically hinged its case upon the proposition that TTB:

- "manufactures tobacco products and holds them for sale at its establishment that does business" in Lubbock, Texas;[62]

- "receives at least one component that it uses to manufacture its tobacco products from outside of Texas;"[63] and

- the specimen product (Specimen Product) offered for sale by TTB without an FDA marketing order was a 30 ML bottled e-liquid named Brewed Beetle Juice which contained 12 mg of nicotine/ml.[64]

CTP thus had the burden at trial to prove that: (1) TTB manufactured and offered the Specimen Product for sale; (2) the Specimen Product contained at least one of the listed PMTA ingredients through interstate

---

[62] *See* ROA. 94 (Complaint, ¶ 14).

[63] ROA 94 (Complaint, ¶ 15).

[64] ROA. 95.

commerce; (3) the ingredients were shipped in interstate commerce; and (4) the Specimen Product lacked an FDA marketing order. 21 C.F.R. § 17.33(b). An evidentiary failure on either element would entitle TTB to a determination in its favor.

### B.   CTP'S PROOF AT TRIAL.

At trial, CTP proffered the testimony of an FDA employee, an FDA contractor and several key exhibits which purported to circumstantially establish the salient facts to prove each of the above questions. TTB alleged at trial that CTP failed to sustain the evidentiary burden of proof imposed by 21 C.F.R. § 17.33(b) because it did not establish the Specimen Product, even if lacking a marketing order, contained ingredients shipped in interstate commerce and was thus being offered for sale in violation of the TCA.[65]

CTP supported this proposition by pointing to: (1) an array of photographs of bulk materials stored in the non-retail portion of TTB's business premises;[66] (2) an array of photographs of the Specimen Product

---

[65] ROA. 56.

[66] ROA. 636 – 654.

on a shelf at TTB's retail premises;[67] and (3) the TTB ingredient list filed with its PMTA which identified the specific ingredients for a 2.4% nicotine e-liquid product also named Beetle Juice and the source of those ingredients.[68] The critical evidentiary link here—whether the Specimen Product contained the listed PMTA ingredients—was missing because CTP failed to show such predicate. Afterall, the Specimen Product is a 1.2% nicotine e-liquid as opposed to the 2.4% nicotine e-liquid product identified in the listed PMTA ingredients.[69]

## C.   CTP'S FAILURE TO CARRY ITS EVIDENTIARY BURDEN.

At trial, CTP supported the allegations in its Complaint with proof which consisted of:

> (1) the sworn declarations of Loretta Chi, a CTP Senior Regulatory Counsel,[70] and Garrett Carter, a CTP-commissioned contractor;[71]

---

[67] ROA. 655 – 667.

[68] ROA. 720 – 722.

[69] TTB acknowledges its analysis of the substantial evidence question is a bit wonky. That, however, is necessary to simplistically explain the mechanics demonstrating why CTP failed to prove the Specimen Product was adulterated or misbranded because it contained ingredients shipped in interstate commerce.

[70] ROA. 615 – 620.

[71] ROA. 621 – 625.

(2) an array of photographs depicting bulk e-liquid ingredients which it premised were manufactured and delivered to TTB through interstate commerce;[72]

(3) an array of photographs depicting the Specimen Product (a 12 mg nicotine, 30 ml TVX Barn Brewed Beetle Juice);[73]

(4) the ingredient listing for a 2.4% nicotine Beetle Juice e-liquid product;[74] and

(5) evidence of the addresses for two of the ingredient manufacturers identified in Trial Exhibit 11 which Mr. Carter allegedly observed at the TTB establishment.[75]

CTP alleged at trial that the Specimen Product contained the exact same ingredients shown in ROA 636 – 654 and listed in ROA 720 – 722. CTP based its proof upon paragraphs 6 and 7 of Mr. Carter's declaration ROA 520 which summarized his observation of the bulk ingredients at TTB's premises.[76] On this point, Mr. Carter testified that he based those

---

[72] ROA. 636 – 654.

[73] ROA. 655 – 667.

[74] ROA. 720 – 722.

[75] ROA. 723 – 726.

[76] TTB did not violate the TCA by maintaining a stock of bulk ingredients upon its premises. ROA. 535 – 565 contains a list of 2,247 TTB products for which FDA issued a marketing denial order. Numerical paragraph 5 of Chi's Declaration, ROA. 616, however, evidences that TTB filed more than 2,400 PMTAs while ROA. 720 identified 2,415 PMTAs. This difference means that FDA was still reviewing the PMTAs for 168 TTB products at the time of Mr. Carter's inspection. As this Court knows from its prior ENDS product cases,

assertions upon the observation of the bulk ingredients shown in ROA. 636 – 654. *See also* ROA. 320 – 321. CTP then relied upon ROA. 715 – 718 to show the out-of-state addresses of some of the manufacturers of the ingredients listed in ROA. 720 – 724 as the basis for establishing the interstate commerce element of its claim.

The entire premise of CTP's proof fell apart when neither Ms. Chi nor Mr. Carter offered evidence which proved the Specimen Product (a 12 mg nicotine product) contained any of the bulk ingredients described in Mr. Carter's testimony.[77] This was the very point which CTP had to prove to sustain its allegations.

### D.  THE INITIAL DECISION'S FINDINGS.

The Initial Decision noted that TTB cited the differences between the Specimen Product and the listed PMTA ingredients (noting that TTB argued the differences in the percentages of nicotine by volume in the two products). ROA. 7. The Initial Decision then noted that TTB established

---

CTP's enforcement policy permits the continued marketing of products subject to a timely PMTA while in review. It was thus reasonable to expect that Mr. Carter would see bulk ingredients in an e-liquid manufacturing facility which makes vaping products for which marketing was permitted at the time by FDA's policies. Ms. Chi offered no proof at trial which established that CTP had issued a marketing denial to any of the remaining 168 TTB products as of the time of Mr. Carter's inspection.

[77] ROA. 321 – 322 (Chi testimony).

through Ms. Chi's testimony the difference between the nicotine content of the products listed in <u>ROA. 720</u> – 722 and the Specimen Product. *Id.* The Initial Decision found there was "no dispute on that point" based upon Ms. Chi's testimony as to that difference but questioned the point's relevance by stressing that:

> "[a]t no point does CTP assert that the products pictured in [<u>Trial Exhibit 6</u>] are the same as that described by Respondent in [<u>Trial Exhibit 11</u>]."[78]

*Id.* But that was the whole point underlying CTP's proof—CTP premised its proof upon the proposition that the ingredients of the Specimen Product matching the listed PMTA ingredients. CTP cannot prevail if there is no match.

Instead, the Initial Decision concluded that TTB had "not offered any evidence" to counter the statements from Ms. Chi that the bulk products observed on the business premises traveled in interstate commerce.[79] The Initial Decision thus concluded, based upon Ms. Chi's testimony, that the listed PMTA ingredients were shipped in interstate commerce. *Id.* The

---

[78] It begs the question that the relevance of the relationship nexus between the Specimen Product and the PMTA ingredient list exists given the fact CTP proffered both exhibits as part of its proof. Surely, CTP would not have done so if the evidence proffered in support of its claims was not relevant.

[79] <u>ROA. 21</u>.

Initial Decision agreed that CTP had to prove the ingredients depicted in ROA. 636 – 654 were used in manufacturing the Specimen Product shown in ROA. 658 – 665. *Id*. The Initial Decision, however, noted that Ms. Chi could not confirm such nexus with "absolute certainty" but while Mr. Carter did not observe any manufacturing, he testified that TTB representatives acknowledged that it manufactured the Specimen Product at its premises. *Id*. The Final Decision thus upheld the conclusion in the Initial Decision that CTP satisfied its evidentiary burden of proof although Mr. Carter's testimony stopped short of asserting that TTB's representatives acknowledged the use of the bulk ingredients observed at the premises when manufacturing the Specimen Product. CTP's claims and TTB's defense turn on the absence of evidentiary support of the claims.

### E. THE SUBSTANTIAL WEIGHT OF EVIDENCE DOES NOT SUPPORT THE INITIAL DECISION.

Here's why the hearing officer got it wrong in the Initial Decision. CTP's entire case hinged on proving the Specimen Product contained the listed PMTA ingredients which were shipped in interstate commerce. CTP failed to carry its burden to prove the Specimen Product contained the bulk ingredients observed by Mr. Carter and identified in the PMTA

ingredient list based upon Ms. Chi's testimony. The Initial Decision, however, made an evidentiary leap based upon Mr. Carter's testimony about the acknowledgements by TTB's representatives that it manufactured the Specimen Product at its premises. Such evidentiary leap lacks a supporting foundation because Mr. Carter did not testify that TTB's representatives acknowledged using the bulk materials he observed or the listed PMTA ingredients to manufacture the Specimen Product.

*First*, contrary to the Final Decision, the relationship between the Specimen Product and the listed PMTA ingredients was, and is, absolutely relevant. CTP's claims rise or fall upon a relationship nexus between these two pieces of evidence because neither Ms. Chi nor Mr. Carter were able to definitively link the ingredients to the Specimen Product. CTP's failure to prove it contained the bulk ingredients and the listed PMTA ingredients shown in <u>ROA. 720</u> – 722 is relevant for the simple reason that CTP predicated its Complaint upon that nexus. CTP presented no evidence which established those ingredients were used in manufacturing the Specimen Product.

*Second*, TTB indeed established evidence at trial through its cross-examination of Ms. Chi to counter CTP's assertion that the Specimen Product contained ingredients shipped in interstate commerce. CTP claimed the Specimen Product was a 30ml e-liquid product named TXV Barn Brewed Beetle Juice which contained 12 mg/ml of nicotine. This fact is plainly evident from the multiple views of the product label shown in ROA. 658 – 663. The listed PMTA ingredients which CTP tied to the Specimen Product, however, related to three bottle sizes (10 ml, 30 ml and 100 ml) of TTB's 2.4% nicotine Beetle Juice e-liquid product. FDA's written guidance establishes without any ambiguity that each vaping product "with a differing flavor variant and/or nicotine strength" is a "different product."[80] The Specimen Product therefore does not relate to the same product which contain the listed PMTA ingredients. That lack of a relation is a difference in FDA's eyes and is thus relevant in determining the sufficiency of the evidence underlying the Initial Decision.

---

[80] FDA, *Premarket Tobacco Product Applications for Electronic Nicotine Delivery Systems: Guidance for Industry*, 20 (Mar. 2023). https://www.fda.gov/media/127853/download

FDA based its written guidance upon sound logic because basic mathematics and science tells us that 1 gram (g) of a substance in a 1 liter solution of liquid would represent 1g/100 milliliters (m/l) or 1% of the whole liquid volume.[81] Determining the percentage volume of the Specimen Product is thus a function of moving the decimal point two places to the left, such that:

> the 12 mg/ml nicotine concentration found in therein equals .12 mg/1ml or a 1.2% total volume.[82]

The PMTA ingredient list relates, however, to an e-liquid product containing 2.4% nicotine by volume. Using the reverse application of the above formula:

> a 2.4% concentration would equal .24 mg/1ml or 24 mg/ml which equals a 2.4% nicotine volume.

It cannot be any more logically grounded than the fact that an e-liquid containing a 1.2% nicotine volume (12mg/ml) is not the same product as an e-liquid containing a 2.4% nicotine volume (24mg/ml).[83]

---

[81] https://www.e-safe-anaesthesia.org/sessions/17_03/d/ELFH_Session/451/tab_627.html

[82] *Id*.

[83] The Specimen Product thus contains half the nicotine content of the product whose ingredients are listed in ROA. 720 – 722.

Given these facts, the Specimen Product did not relate to any of the three products shown on the PMTA ingredient list which CTP offered to prove the crucial interstate commerce element of its claim. This factual difference matters significantly because CTP had to prove that TTB "receives at least one component that it uses to manufacture its tobacco products from outside of Texas."[84] Ms. Chi could not establish the evidentiary link between and Mr. Carter's testimony did not establish that TTB's representatives admitted using the bulk ingredients he observed to manufacture the Specimen Product.

The Appeals Panel's decision to uphold the Initial Decision is further undermined by the fact that the Specimen Product's label merely says it included "USP Vegetable Glycerin, USP Propylene Glycol, Natural and Artificial Flavoring, Nicotine" without identifying that any of the bulk ingredients or the listed PMTA ingredients were among the specific ingredients identified on the label or the source of any such ingredients.

The Appeals Panel erred because the Initial Decision lacked the sufficient evidence required by 5 U.S.C. § 706(2)(E) to support the finding that TTB was offering a product manufactured with ingredients supplied

---

[84] ROA. 56 (Complaint, ¶ 15).

via interstate commerce in violation of 21 U.S.C. § 331(k). The Court must therefore vacate the Final Decision and remand this appeal with instructions to dismiss CTP's Complaint.

## CONCLUSION

This Court should grant TTB's Petition for Review and both vacate and remand the Appeals Panel's Final Decision with instructions to dismiss CTP's Complaint.

Dated: July 3, 2025

Respectfully submitted,

By:  */s/ J. Gregory Troutman*
J. GREGORY TROUTMAN
TROUTMAN LAW OFFICE, PLLC.
  4205 Springhurst Boulevard, Suite 201
  Louisville, Kentucky 40241
  (502) 412-9179
  jgtatty@yahoo.com
  *Attorney for Petitioner*

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.  This document complies with the word limit of FED. R. APP. P. 27(d)(2)(A) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and FED. R. APP. P. 27(d)(2), this document contains 10,043 words.

2.  This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook, size 14.

*/s/ J. Gregory Troutman*
J. GREGORY TROUTMAN
*Attorney for Petitioner*

### CERTIFICATE OF SERVICE

Pursuant to FED. R. APP. P. 15(c), I hereby certify that on July 7, 2025, true and correct copies of the foregoing **Petitioner's Brief** was filed with the Clerk's Office for the United States Court of Appeals for the Fifth Circuit using the CM/ECF system.

*/s/ J. Gregory Troutman*
J. GREGORY TROUTMAN
*Attorney for Petitioner*